# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| VERNON J. DAVIS, | No. CV-06-0316-AAM |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA* |
| vs. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

**BEFORE THE COURT** are plaintiff's motion for summary judgment (Ct. Rec. 13) and the defendant's motion for summary judgment (Ct. Rec. 15).

## JURISDICTION

Vernon J. Davis, plaintiff, applied for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income benefits ("SSI") on September 22, 2003. The applications were denied initially and on reconsideration. Plaintiff timely requested a hearing and a hearing was held on

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT-    1**

August 18, 2005, before Administrative Law Judge (ALJ) Paul Gaughen. Plaintiff, represented by counsel, appeared and testified at this hearing. Also testifying were George Rodkey, M.D., as a medical expert, and K. Diane Kramer, as a vocational expert. A supplemental hearing was held on October 27, 2005. Plaintiff, represented by counsel, appeared and testified at this hearing. Ronald M. Klein, Ph.D., testified as a medical expert, and Tom L. Moreland testified as a vocational expert. On July 12, 2006, the ALJ issued a decision denying benefits. The Appeals Council denied a request for review and the ALJ's decision became the final decision of the Commissioner. This decision is appealable to district court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## STATEMENT OF FACTS

The facts have been presented in the administrative transcript, the ALJ's decision, the plaintiff's and defendant's briefs, and will only be summarized here. At the time of the administrative hearings, plaintiff was 47 years old. He has the equivalent of a high school education and past relevant work experience as an industrial truck driver, warehouse laborer, sales attendant, and construction worker. Plaintiff alleges disability since September 1, 2003 due to a combination of hepatitis C and resulting cirrhosis, and a mental impairment. Plaintiff's date last insured for DIB is June 2004.

## STANDARD OF REVIEW

"The [Commissioner's] determination that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence, 42 U.S.C. § 405(g)...." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983). Substantial evidence is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance. *McAllister v. Sullivan*, 888 F.2d 599, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health and*

*Human Services*, 846 F.2d 573, 576 (9th Cir. 1988).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971).  "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld.  *Beane v. Richardson*, 457 F.2d 758, 759 (9th Cir. 1972); *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965).  On review, the court considers the record as a whole, not just the evidence supporting the decision of the Commissioner.  *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989), quoting *Kornock v. Harris*, 648 F.2d 525, 526 (9th Cir. 1980); *Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir. 1982).

It is the role of the trier of fact, not this court to resolve conflicts in evidence.  *Richardson*, 402 U.S. at 400.  If evidence supports more than one rational interpretation, the court must uphold the decision of the ALJ.  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

A decision supported by substantial evidence will still be set aside if the proper legal standards were not applied in weighing the evidence and making the decision.  *Brawner v. Secretary of Health and Human Services*, 839 F.2d 432, 433 (9th Cir. 1987).

## ISSUES

Plaintiff argues the ALJ erred in finding that he does not have a "severe" mental impairment, and erred in his determination of plaintiff's physical residual functional capacity (RFC).

## DISCUSSION

### SEQUENTIAL EVALUATION PROCESS

The Social Security Act defines "disability" as the "inability to engage in

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-    3**

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). The Act also provides that a claimant shall be determined to be under a disability only if her impairments are of such severity that the claimant is not only unable to do her previous work but cannot, considering her age, education and work experiences, engage in any other substantial gainful work which exists in the national economy. *Id*.

  The Commissioner has established a five-step sequential evaluation process for determining whether a person is disabled. 20 C.F.R. §§ 404.1520 and 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S.Ct. 2287 (1987). Step one determines if she is engaged in substantial gainful activities. If she is, benefits are denied. 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i). If she is not, the decision-maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which compares the claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); 20 C.F.R. § 404 Subpart P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one conclusively presumed to be disabling, the evaluation proceeds to the fourth step which determines whether the impairment prevents the claimant from performing work she has performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). If the claimant cannot perform this work, the fifth and final step in the process

determines whether she is able to perform other work in the national economy in view of her age, education and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v).

The initial burden of proof rests upon the claimant to establish a prima facie case of entitlement to disability benefits. *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). The initial burden is met once a claimant establishes that a physical or mental impairment prevents her from engaging in her previous occupation. The burden then shifts to the Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2) that a "significant number of jobs exist in the national economy" which claimant can perform. *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

**ALJ'S FINDINGS**

The ALJ found that plaintiff has a "severe" physical impairment, namely hepatitis C with associated cirrhosis of the liver, but that he does not have a "severe" mental impairment. The ALJ found that plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. § 404 Subpart P, App. 1. The ALJ found that plaintiff has the residual functional capacity (RFC) to perform work at the "light" exertional level, specifically that he could lift and carry up to 20 pounds occasionally, and up to 10 pounds frequently; sit at least 2 hours of an 8 hour workday with normal breaks; and stand and/or walk up to 6 hours in an 8 hour workday with normal breaks. See 20 C.F.R. §§404.1567(b) and 416.967(b). The ALJ also determined that plaintiff would need to avoid employment where alcohol is present; avoid unprotected heights; and only occasionally use ladders and scaffolding. While the ALJ found this RFC precluded plaintiff from performing his past relevant work which required medium and heavy exertion, the ALJ also found, based on vocational expert testimony, that it did not preclude plaintiff from

performing other jobs existing in significant numbers in the national economy. Accordingly, the ALJ concluded the plaintiff is not disabled.

**"SEVERE" MENTAL IMPAIRMENT**

A "severe" impairment is one which significantly limits physical or mental ability to do basic work-related activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c). It must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. It must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not just the claimant's statement of symptoms. 20 C.F.R. §§ 404.1508 and 416.908.

Step two is a *de minimis* inquiry designed to weed out nonmeritorious claims at an early stage in the sequential evaluation process. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), citing *Bowen*, 482 U.S. at 153-54 ("[S]tep two inquiry is a *de minimis* screening device to dispose of groundless claims"). "[O]nly those claimants with slight abnormalities that do not significantly limit any basic work activity can be denied benefits" at step two. *Bowen*, 482 U.S. at 158 (concurring opinion). "Basic work activities" are the abilities and aptitudes to do most jobs, including: 1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; 2) capacities for seeing, hearing, and speaking; 3) understanding, carrying out, and remembering simple instructions; 4) use of judgment; 5) responding appropriately to supervision, co-workers and usual work situations; and 6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b) and 416.921(b).

In November 2003, plaintiff was seen by John F. McRae, Ph.D. Dr. McRae performed a mental status examination of the plaintiff and also administered several psychological tests, including the Trail Making Test A and B, the Rey Visual Memorization Test, and the MMPI-2 (Minnesota Multiphasic Personality

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-      6**

Inventory).  Dr. McRae noted that plaintiff was "deliberately slow" on the Trail Making Test.  (Tr. at pp. 130-31).  As a result, the Rey Visual Memorization Test was administered.  On this test, the plaintiff was able to recall and reproduce 6 of the 15 items.  Dr. McRae cited authority suggesting "that anyone unable to recall at least nine of the 15 items may be suspicious for malingering or not giving full effort to their performance on the Rey."  (Tr. at p. 131).  Plaintiff's scores on the MMPI-2 resulted in an invalid MMPI profile, the source of the invalidity being "either in exaggeration of symptoms or in a 'plea for help.'" (*Id*.).  Dr. McRae diagnosed the plaintiff with adjustment disorder with mixed features, substance dependence in full sustained remission, and a personality disorder NOS (not otherwise specified).  (*Id*.).  According to Dr. McRae: " It appears from the results of the Rey as well as the MMPI that Mr. Davis either overstated his symptoms and limitations or he endorse a number of symptoms in order to make prominent his need for assistance." (*Id*.).  The doctor added that because the plaintiff "has been depressed and frustrated since learning he had hepatitis C a month ago and treatment for it [,] as well as for his emotional condition[,] has just started in the past month, I believe it is possible that we will see improvement ahead in both of those areas in the next six to nine months."  (Tr. at pp. 131-32).

Dr. McRae completed a Washington Department of Social & Health Services (DSHS) form evaluation at the same time (November 2003) in which he indicated that plaintiff had a number of "moderate" and "marked" cognitive and social limitations.  (Tr. at p. 135).  Consistent with his narrative report, Dr. McRae indicated these limitations would last a maximum of nine months and a minimum of six months.  (Tr. at p. 136).

The record reflects that plaintiff was first diagnosed with hepatitis C in August 2003, and a follow-up biopsy revealed evidence of cirrhosis.  He was then treated for several months with interferon and ribavirin combination therapy, and "apparently developed significant psychiatric side effects of anxiety and

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-        7**

depression and ultimately had cessation of his treatment after only several months." (Tr. at p. 229). It appears that sometime in May 2004, the plaintiff resumed the combination therapy for his hepatitis C. (Tr. at p. 235 and p. 238).

In September 2003, plaintiff started seeing Janice K. Simchuk, M.S., a psychotherapist. (Tr. at p. 220). In a March 22, 2004 letter, Ms. Simchuk indicated that she administered an MMPI-2 to the plaintiff to "preclude any concerns" about his emotional stability. (*Id*.). According to Ms. Simchuk:

> His MMPI results reflect a valid test. He had no scores within the criteria of concern. He was not significant for depression or anxiety and his scores reflect no mood disorder, which might make him unacceptable to a medication regime. He is a very social individual. He is somewhat traditional in his view of roles of men and women. Other than that, his MMPI-2 demonstrated no significant issues regarding mood or personality disorder. . . . He appears to be in a fairly solid emotional relationship and he has been working for his father and continues to have steady employment.

(*Id*.). The "medication regime" she referred to was the regime for hepatitis C.

In July 2004, when plaintiff was eight weeks into his second attempt at combination therapy, he was seen by a physician's assistant at the Rockwood Clinic who reported:

> He has tolerated the medications quite well and has very few complaints at this time. Fatigue has been somewhat noticeable but certainly not a major problem for him. This is his second attempt at treatment with interferon and his first was complicated by psychiatric side effects, including anxiety and some degree of depression. He has not experienced these at this time and states he is doing much better overall.

(Tr. at p. 238). In August 2004, after 12 weeks of therapy, the same physician's assistant reported that plaintiff continued to "tolerate treatment quite well" and "essentially has no complaints other than intermittent fatigue and slight decrease in ability to concentrate, which is tolerable." Furthermore, plaintiff had

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-        8**

experienced "no depression or cytopenia."[1]  (Tr. at p. 239).  In September 2004, after 16 weeks of therapy, the plaintiff reported that he had some "intermittent" problems with anxiety for which he was taking some medication with "excellent effect," and that he had discussed with Stephen F. Lewis, M.D., "treatment for depression with Wellbutrin." (Tr. at p. 242).  In November 2004, after 24 weeks of combination therapy, it was reported that plaintiff had been utilizing Xanax "to good effect for his anxiety" and that he had not had "any significant depression, and this medication [Xanax] seems to control his symptoms . . . ." (Tr. at p. 247).[2] In January 2005, after 32 weeks of combination therapy, it was reported that plaintiff had experienced irritability and "exacerbation of his underlying anxiety disorder," although this had been "managed well" with medication.  (Tr. at p. 252).  In May 2005, one month after completion of his 48 week course of treatment, plaintiff reported that his energy level had returned to "near normal" and that he was not "experiencing as much anxiety." (Tr. at p. 274).

Plaintiff was referred by his attorney to Dennis R. Pollack, Ph.D, for psychological testing in July 2005.  The testing included the WAIS-III (Wechsler Adult Intelligence Scale) with the following results: Verbal IQ of 85; Performance IQ of 74; Full Scale IQ of 76; Processing Speed Index of 79; Working Memory Index of 71.  (Tr. at p. 281).  The testing also included the MMPI-2, the results of which included an "F-scale score that suggests he was attempting to present himself in a most unfavorable light." (Tr. at p. 281).  According to Dr. Pollack:

> His scores are much worse than have been found in the past. Issues raised by his elevated F-scale were discussed with him. He states that many of the problems reflected in the F-scale are the result of his hepatitis C.  He has been suffering from high levels of anxiety and worrying about whether he is going to survive and if he survives what he is going to do.  He sees

---

[1] "Cytopenia" is a reduction in the number of blood cells.  See www.cancer.gov

[2] Plaintiff apparently never took the Wellbutrin.

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-        9**

> his world as being full of problems and with little hope for the future.

(Tr. at p. 282).

Dr. Pollack also administered the Millon Clinical Multiaxial Inventory-III (MCMI-III) test to the plaintiff. Accompanying the test results was a brief narrative report which stated in part that:

> The patient's response style may indicate a broad tendency to magnify the level of experienced illness or a characterological inclination to complain or to be self-pitying. On the other hand, the response style may convey feelings of extreme vulnerability that are associated with a current episode of acute turmoil.

(Tr. at p. 300).

Dr. Pollack also administered the Test of Memory Malingering (TOMM) to the plaintiff. Plaintiff scored 48 and 49 for Trials 1 and 2 respectively and, according to Dr. Pollack, the scores indicated plaintiff "was making good effort and argue against malingering." (Tr. at p. 282).[3]

Dr. Pollack diagnosed the plaintiff with "Anxiety Disorder due to Hepatitis C" and offered the following summation of plaintiff's condition:

> The results of the personality testing reveals a strong tendency to present himself in a most unfavorable light. His scores also reveal an individual who suffers from very high levels of anxiety and depression. A test of malingering indicates that he was making good effort and suggests that his personality test scores were a reflection of his emotional status rather than a pre-existing illness. . . . He is a very anxious individual who is preoccupied with his hepatitis C. He is extremely fearful that he is not going to recover even with the treatment of interferon. He uses some compulsive behaviors to control intrusive thoughts but he still suffers from episodes of high anxiety which he describes as

---

[3] The TOMM score sheets (Tr. at pp. 308-09) indicated that the "Total Correct for Trial 1" was 2 and the "Total Correct for Trial 2" was 1. Dr. Klein cited this as evidence of malingering (Tr. at pp. 330-31), but Dr. Pollack's narrative report makes clear that the total correct for Trial 1 was 48 and the total correct for Trial 2 was 49.

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-      10**

> panic attacks. They appear to be directly related to his hepatitis C rather than a pre-existing illness. The attacks occur when he cannot block out his fears of dying due to the hepatitis C.

(Tr. at p. 283).

Dr. Pollack completed a "Mental Medical Source Statement" in which he indicated that plaintiff had "marked" limitations in his abilities to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at pp. 284-86).

In September 2005, plaintiff was seen again by Dr. McRae for psychological evaluation. Dr. McRae noted that plaintiff was vague in answering questions and at times, did not provide a full response to questions asked of him. (Tr. at p. 291). Dr. McRae administered the WAIS-III to the plaintiff with the following results: Verbal IQ of 77; Performance IQ of 74; Full Scale IQ of 74; Processing Speed Index of 69; and Working Memory Index of 82. (Tr. at p. 292). Dr. McRae commented on the difference between his results and the results of Dr. Pollack from two months earlier:

> It is mildly surprising that his verbal IQ score today is lower than Dr. [Pollack] found in July. There was a drop of one standard deviation in his verbal IQ. There is also a drop of two-thirds of a standard deviation in the processing speed index today. There is an improvement of two-thirds of a standard deviation in his working memory. He seemed to give up easily at times with "don't know" answers. I think today's testing is likely an underestimate of his general mental ability, probably most likely related to his somewhat diminished effort.

(Tr. at p. 292).

Dr. McRae noted that with regard to the Beck Depression Inventory II, "[q]ualitatively, [plaintiff's] responses at times seemed exaggerated on the

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-       11**

symptom and limitation side." (Tr. at p. 293). The plaintiff registered a severe score on the Beck Anxiety Index, but Dr. McRae was unable to observe such a degree of anxiety in the plaintiff. The doctor noted that medical records indicated plaintiff's anxiety symptoms were controlled by Xanax and plaintiff acknowledged this was so. (*Id*.).

Dr. McRae gave plaintiff the M-FAST (Miller Forensic Assessment Screening Test). While plaintiff's total M-FAST score was not indicative of malingering, "some of his rare combination of items and hallucinations raise[d] questions" for Dr. McRae about the plaintiff "exaggerating some psychiatric symptoms." (*Id*.).

With regard to the WMS-III (Wechsler Memory Scale) results, Dr. McRae noted that plaintiff's auditory recognition score was "quite low" compared to his other index scores. Dr. McRae thought it "curious that [plaintiff] would not be able to recognize information he provided earlier in the testing." Because on a "qualitative level," it seemed to Dr. McRae that plaintiff was not "forthcoming with information," the "rarely missed item procedure was triggered," the results suggesting that plaintiff was "malingering memory problems." (Tr. at p. 294).

With regard to the MMPI-2 which he administered to the plaintiff, Dr. McRae offered this interpretation of plaintiff's scores:

> Five of his seven clinical scales are markedly elevated. His F score with a T-score of 95 suggests to me that his MMPI profile is invalid. This was also true in Dr. Pollack's July 2005 evaluation of Mr. Davis. It was also the case in November of 2003, when I evaluated Mr. Davis for the first time . . . . I believe the reasons for that are both his focus on and his exaggeration of his symptoms levels.

(*Id*.).

Dr. McRae diagnosed plaintiff with depressive disorder NOS (not otherwise specified); anxiety disorder NOS; alcohol, amphetamine, cocaine and cannabis dependence in full-sustained remission; "partial malingering;" personality disorder NOS; and a provisional diagnosis of borderline intellectual functioning. (*Id*.). In

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT- 12**

his judgment, Dr. McRae thought plaintiff undoubtedly had anxiety and depressive symptoms, but "not to the degree that he endorses." (Tr. at p. 295).

In a "Medical Source Statement Of Ability To Do Work-Related Activities (Mental)," Dr. McRae indicated that plaintiff would have "moderate" limitations in understanding and remembering detailed instructions, carrying out detailed instructions, and working with or near others without being distracted by them. (Tr. at p. 296).

Dr. Klein testified as a medical expert at the supplemental administrative hearing. Based on his review of the record, he opined that the plaintiff was malingering. Among the things he highlighted from the record was that plaintiff's F-scale score on the MMPI-2 administered by Ms. Simchuk in February 2004 was within the normal range and there were no elevated scales as compared to the subsequent MMPI-2 administered by Dr. Pollack in July 2005. (Tr. at p. 334). Dr. Klein acknowledged that plaintiff experiences symptoms of anxiety and depression due to Hepatitis C and cirrhosis, and due to his substance abuse, but asserted they did not qualify as "severe" because they would not have impaired the ability to work for a period of at least 12 months. (Tr. at p. 335).

The ALJ relied on Dr. Klein's opinion in determining that plaintiff does not have a "severe" mental impairment. The opinion of a non-examining medical expert/advisor need not be discounted and may serve as substantial evidence when it is supported by other evidence in the record and consistent with the other evidence. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). Dr. Klein's opinion is supported by other evidence in the record and is consistent with that other evidence. In his November 2003 report, Dr. McRae stated it was possible there would be improvement in plaintiff's emotional condition in six to nine months. He also indicated at that time that plaintiff's "moderate" and "marked" limitations would last a minimum of six months and a maximum of nine months. The record bears out that there was improvement in that time period. In March

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-      13**

2004, Ms. Simchuk indicated that plaintiff "was not significant for depression or anxiety."[4] And as the above cited chart notes reveal, once plaintiff embarked on his second attempt at combination therapy for Hepatitis C, his degree of anxiety and/or depression was reported to be either non-existent, intermittent, insignificant, or decreased, and otherwise controlled by medication. In May 2005, one month after completion of his 48 week course of treatment, plaintiff reported that his energy level had returned to "near normal" and that he was not "experiencing as much anxiety." Shortly after this, at the request of his counsel, plaintiff was seen by Dr. Pollack in July 2005. While Dr. Pollack opined that plaintiff had some "marked" cognitive limitations, he also made it clear that this was due to an anxiety disorder arising from plaintiff's hepatitis C. His anxiety symptoms "appear to be directly related to hepatitis C rather than pre-existing illness" and his "anxiety attacks occur when he cannot block out his fears of dying due to the hepatitis C." (Tr. at p. 283). What plaintiff reported to Dr. Pollack in terms of the "severity" of his symptoms was significantly worse than what he reported during the course of his combination therapy for hepatitis C and what had been observed by others during the course of the therapy. Of course, what makes that suspicious is Dr. Pollack's own testing and the testing by Dr. McRae, previous and subsequent to Dr. Pollack's testing, indicating there was malingering by the plaintiff. In his September 2005 evaluation, Dr. McRae could not avoid this conclusion, conceding there was at least "partial malingering" by the plaintiff. Dr. McRae did not offer an explanation of what constitutes "partial malingering"

---

[4] Because Ms. Simchuk is not an "acceptable" medical source, 20 C.F.R. §§404.1513(a) and (d) and 416.913(a) and (d), the Commissioner may accord her opinion less weight. *Gomez v. Chater*, 74 F.3d 967, 970-71 (1996). "Less weight," however, does not mean "no weight." ALJs are "not free to disregard the opinions of mental health providers simply because they are not doctors." *Duncan v. Barnhart*, 368 F.3d 820, 823 (8th Cir. 2004).

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-      14**

and Dr. Klein testified such a diagnosis does not exist as it is an all or nothing proposition (either there is malingering or there is not). (Tr. at p. 339). Dr. Klein's opinion that plaintiff did not have a "severe" mental impairment for any 12 month period following his alleged onset date of September 1, 2003 is supported by substantial evidence in the record and constituted a specific and legitimate reason for discounting the opinions of Drs. McRae and Pollack to the extent they opined that plaintiff had a "severe" mental impairment.[5]

At the hearing, Dr. Klein stated:

> I'm not testifying [plaintiff] doesn't experience depressive and anxiety symptoms[.] [W]hat I'm saying is that they would be under the impairment non-severe category. That they would be emotional experiences that do not meet [or] impair [substantial gainful activity] for 12 months or more or even anything close to that. So that there is simply characteristics of his psychological function that he would take with him to work in the years that he did work.

(Tr. at p. 335).

The record supports Dr. Klein's statement in that there are references to plaintiff doing some "work" even after his alleged onset date of September 1, 2003. A December 2003 chart note from Inland Empire Gastroenterology stated that plaintiff had not taken his interferon shot that week and had tapered himself off the Xanax and Vicodin and was feeling much better and thinking clearly and as a result, "[h]is father is quite pleased, as he has improved his performance at work." The note indicates the plaintiff and his father had agreed to decrease his hours to four hours a day. (Tr. at p. 183). A February 19, 2004 Rockwood Clinic chart note from Philip Delich, M.D., indicated that plaintiff had moved back to Spokane and "works for his father in a construction/granite work-type position." (Tr. at p. 229). In March 2004, Ms. Simchuk confirmed that "plaintiff has been

---

[5] An ALJ may reject the opinions of examining physicians only for specific and legitimate reasons that are supported by substantial evidence in the record. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995).

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-      15**

working for his father and continues to have steady employment." (Tr. at p. 220).[6]

The fact plaintiff continued to work after his alleged onset date diminishes his credibility concerning his statements about the severity of his anxiety and depressive symptoms. There are, however, other things in the record which diminish his credibility. For example, there is a notation from November 2003 indicating that plaintiff asked the office of Bradley Bale, M.D., to not send him any more bills for the balance left owing after payment by his insurance. According to the notation:

> [Plaintiff] told me to bill for office visits to pay off his balance. I told him we could not bill for things we did not do & that it was illegal to do so. He told me I was too honest & to talk to the Dr about it & that all of the other Drs in town bill for things they don[']t do to cover his balances.

(Tr. at p. 164). The ALJ relied on this information in discounting plaintiff's credibility. (Tr. at p. 26). The plaintiff's lack of credibility is consistent with the affirmative evidence of malingering in the record and further supports the ALJ's conclusion that plaintiff did not suffer from a "severe" mental impairment for any 12 month period following his alleged onset date of September 1, 2003.

//
//

---

[6] The ALJ found that plaintiff had not engaged in substantial gainful activity since September 1, 2003 (Tr. at p. 16), although he did not discuss these references to the plaintiff working for his father after that date. Whether or not this work was substantial gainful activity, it is relevant to plaintiff's capacity to perform basic work-related activities after September 1, 2003 (i.e., whether he had a "severe" impairment for any 12 month period after that date). "Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did." 20 C.F.R. §§404.1571 and 416.971. All of the medical and vocational evidence in a claimant's file is considered in determining whether or not he or she has the ability to engage in substantial gainful activity. *Id*.

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-       16**

**PHYSICAL RESIDUAL FUNCTIONAL CAPACITY**

There is no evidence in the record that is contrary to the ALJ's determination that plaintiff retains the exertional capacity to perform "light" work consisting of lifting and carrying up to 20 pounds occasionally and up to 10 pounds frequently; sitting at least 2 hours in an 8 hour workday with normal breaks; and standing or walking up to 6 hours in an 8 hour workday with normal breaks. No examining physician opined that the plaintiff had particular restrictions on his exertional capacity that would suggest inability to perform "light" work. Based on his review of the record, Dr. Rodkey, the medical advisor at the first hearing, testified that after combination therapy, plaintiff's liver function studies were normal and were expected to remain so unless the plaintiff resumed consumption of alcohol. (Tr. at p. 357). Dr. Rodkey testified that a month or two after hepatitis C treatment would be required in order to regain one's strength. (Tr. at pp. 359-60). Dr. Rodkey opined that from a physical point of view, the plaintiff was capable of "light" work. (Tr. at p. 358).

There is evidence in the record reasonably indicating plaintiff's capacity for "light" work. In July 2005, plaintiff reported to Dr. Pollack that he had no problems with his ability to walk and that his personal activities included washing dishes, mowing the lawn, making beds, dusting, sweeping and washing clothes. (Tr. at pp. 280-81). A September 2004 chart note from the Rockwood Clinic indicated that plaintiff enjoyed weightlifting and walking. (Tr. at p. 240). In January 2004, plaintiff asked that he be put on disability, but James T. Doyle, M.D., did not feel comfortable doing so "since his hepatitis C and cirrhosis do not warrant disability." (Tr. at p. 185). As noted above, there is evidence that in the latter part of 2003 and the early part of 2004, the plaintiff continued to work, at least part-time, for his father in a "construction/granite work-type position."

An ALJ can only reject a plaintiff's statement about pain and physical limitations based upon a finding of "affirmative evidence" of malingering or

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT-    17**

1   "expressing clear and convincing reasons" for doing so.  *Smolen v. Chater*, 80
2   F.3d 1273, 1283-84 (9th Cir. 1996).  "In assessing the claimant's credibility, the
3   ALJ may use ordinary techniques of credibility evaluation, such as considering the
4   claimant's reputation for truthfulness and any inconsistent statements in [his]
5   testimony." *Tonapeytan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).  See also
6   *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir.2002)(following factors may be
7   considered:  1) claimant's reputation for truthfulness;  2) inconsistencies in the
8   claimant's testimony or between his testimony and his conduct; 3) claimant's daily
9   living activities; 4) claimant's work record; and 5) testimony from physicians or
10  third parties concerning the nature, severity, and effect of claimant's condition).  In
11  this case, because there was "affirmative evidence" in the record of malingering,
12  the ALJ was not required to provide "clear and convincing" reasons for finding the
13  plaintiff not credible.   Instead, all the ALJ needed to provide were "specific"
14  reasons for discrediting plaintiff's testimony.  *Bunnell v. Sullivan*, 947 F.2d 341,
15  346 (9th Cir. 1991).  Such reasons were provided.

16      Substantial evidence supports the ALJ's determination regarding plaintiff's
17  physical residual functional capacity.

18  //
19  //
20  //
21  //
22  //
23  //
24  //
25  //
26  //
27  //
28  //

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-        18**

## CONCLUSION

Substantial evidence supports the Commissioner's decision that plaintiff was not disabled for any continuous 12 month period after September 1, 2003, the alleged onset date. Accordingly, defendant's motion for summary judgment (Ct. Rec. 15) is **GRANTED** and plaintiff's motion for summary judgment (Ct. Rec. 13) is **DENIED**. The Commissioner's decision denying benefits is **AFFIRMED**.

**IT IS SO ORDERED.** The District Executive shall enter judgment accordingly and forward copies of the judgment and this order to counsel.

**DATED** this   11th   of June, 2007.

  s/ Alan A. McDonald
            ALAN A. McDONALD
    Senior United States District Judge

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-     19